### CASPER WOLF v. JOHN EDMONSTON and Others.[1]

October 19, 1906.

Nos. 14,813—(32).

**Record of Mortgages.**

> When two mortgages on the same land, executed by a mortgagor to two different mortgagees, are filed for record at the same time by the common agent of the mortgagees, and no instructions are given, the priority of the liens is determined presumptively by the order in which the instruments are numbered by the register. The evidence in the case *held* not sufficient to overcome the statutory presumption.

Appeal by plaintiff from an order of the district court for Clay county, Baxter, J., denying a motion to set aside the findings of fact and conclusions of law, and for a new trial. Reversed and a new trial granted.

*Edwin Adams* and *Jno. M. Hemmingway,* for appellant.

*C. A. Nye,* for respondents.

ELLIOTT, J.

In an action to determine adverse claims to the northwest quarter and south half of the southwest quarter of section 6, township 139,

[1] Reported in 109 N. W. 233.

range 47, in Clay county, the court found that the title to the south half of the southwest quarter is absolute in the plaintiff, Casper Wolf, and that the northwest quarter of said section is owned in common by Casper Wolf and the defendant, John Edmonston. From an order denying a new trial, the plaintiff appealed to this court. It is conceded that Edmonston is the owner of the north half of the southwest quarter, and the appeal involves only the question of the ownership of the northwest quarter of the section. For convenience the northwest quarter will be referred to as tract A, the north half of the southwest quarter as tract B, and the south half of the southwest quarter as tract C.

1. The evidence discloses the following facts:

(a) Tract A in question was acquired by one Moore from the government. March 1, 1881, he mortgaged it to Edward R. Ruggles to secure a loan of $900. By subsequent conveyances the title passed, subject to the mortgage, to John Erickson. The Ruggles mortgage was foreclosed, and the title to the land became absolute in Ruggles, on June 1, 1886. April 27, 1887, Ruggles deeded the land back to Erickson for a consideration of $1,387. Of this amount $387 appears to have been paid in cash, and for the balance Erickson gave to Ruggles a mortgage on the same land.

(b) At this time Erickson also owned tracts B and C, and Ruggles held another mortgage on C. Tract B was free from incumbrance. June 20, 1887, as security for the payment of $1,500, Erickson gave a mortgage to John D. Edmonston on A, B, and C—the entire west half of section 6. The mortgage to Ruggles for $1,000 and the mortgage to Edmonston for $1,500 were executed on the same day, and were both filed in the office of the register of deeds of Clay county on June 20, 1887, at eleven o'clock a. m. In these transactions Ruggles and Edmonston were represented by Frank J. Burnham. The Ruggles mortgage was by the register of deeds numbered 405, and the Edmonston mortgage 408.

(c) We find, then, that just prior to June 20, 1887, the title to B and C was in John Erickson. Ruggles held the absolute fee-simple title to A, and a mortgage on C, which it is conceded subsequently ripened into a good title. Ruggles deeded A to Erickson. After these mortgages were given, Ruggles then held a mortgage of $1,000

on A, which appellant claims was a first lien. Edmonston held a mortgage for $1,500, which admittedly was a first lien on B and a second lien on C, and which respondent Edmonston claims was a lien on A co-ordinate with the Ruggles mortgage for $1,000.

2. Neither mortgage was ever paid. They were both foreclosed, and A was bid in by Ruggles at the foreclosure sale of March 17, 1894, for the sum of $1,712. Edmonston at the sale on June 2, 1894, bid in A, B, and C for the sum of $1,000, leaving a balance of his debt unpaid. There was no redemption from either sale. Edmonston acquired absolute title to B, and entered into possession thereof, and subsequently paid taxes thereon. Ruggles, through another conveyance, acquired title to C, and entered into possession of it, and also of A, upon which he subsequently paid taxes. From Ruggles the land passed through several conveyances to the appellant, Wolf.

3. Was the Ruggles mortgage a first lien, or were the Ruggles and Edmonston mortgages co-ordinate liens, on A? The question of priority of liens is determined by the intention of the common agent of the mortgagees when he filed the instruments for record. The two mortgages were filed by Burnham, the representative of both mortgagees, at the same time, and there is no evidence to show that he gave any instructions to the register of deeds as to the order in which they should be filed and numbered. R. L. 1905, § 538 (G. S. 1894, § 767), provides that:

> Every register shall indorse plainly upon the top of the back, when folded, of each instrument received by him for record or filing as soon as received, a number consecutive to the number affixed to the instrument next previously received, and shall enter such number as a part of the entry relating to such instrument in all the indexes kept in his office, and on the margin of the record of the instrument and such number shall be prima facie evidence of priority of registration. If more than one instrument shall be received at the same time, by mail or other like enclosure, the register shall affix such number in the order directed by the sender, and if no direction be given, then in the order in which the instruments actually come to his hand in opening the enclosures.

In the absence of any showing to the contrary, we must therefore hold that these mortgages took priority in the order in which they were numbered. Connecticut Mut. Life Ins. Co. v. King, 80 Minn. 76, 82, 82 N. W. 1103. We start, then, with the presumption that the Ruggles mortgage was a first lien on the tract in question, and must determine whether the record contains evidence sufficient to sustain the finding that Burnham intended that the two mortgages should co-ordinate. Neither Ruggles nor Edmonston was ever a resident of Minnesota. They were both represented by Frank J. Burnham, who it is admitted was the general agent, fully authorized by both to make loans, to reinvest money in his hands, pass upon the sufficiency of securities and titles, collect interest, pay taxes, and generally supervise their loaning interests and do everything necessary and incidental thereto. He occupied the same relation to both parties. Respondent infers that Burnham intended that the mortgages should be co-ordinate from the fact that they were executed at the same time by the common agent; that each party took his mortgage with constructive knowledge of the rights of the other; that the Ruggles mortgage was no more a purchase mortgage than was that of Edmonston, because a part of the proceeds of the Edmonston loan was used to pay judgment liens already on the land; that the Ruggles mortgage was not a renewal of the old mortgage of 1881; and from other circumstances not necessary to enumerate.

We do not think the evidence is sufficient to overthrow the statutory presumption. It points rather to the inference that Burnham intended that the Ruggles mortgage should be a first lien, and thus supports the statutory inference. Burnham owed an equal duty to Ruggles and Edmonston. It will be presumed that he did not intend to give one of his investing clients an unfair advantage over the other, or sacrifice the interests of the one for the benefit of the other. When the question of making these loans presented itself to him, Ruggles held the absolute title to A. He had $1,378 invested in the land. He had also a first lien on C. Edmonston was not interested in either tract. It may be assumed that Burnham wished to readjust matters and give Erickson another chance. To do this required some cash, and, as he had money belonging to Edmonston ready for investment, he decided to use it in this way. It does not appear that he in-

tended to put Ruggles in a worse position than he was already in. Erickson had lost A, and was having difficulty in paying what was due on C. He held B free from incumbrance. Burnham loaned Erickson $1,500 of Edmonston's money. The only land which Erickson had free from incumbrance was B, and upon this the Edmonston mortgage was made a first lien. It was the primary security, but as additional security the mortgage was made to cover A and C also—the entire west half of the section. It would be unreasonable to infer that he intended to deprive Ruggles of the security of the land which he already owned in fee and which he was selling back to Erickson. The value of the latter's equity in A was increased by the payment of $387 in cash, and Edmonston's second lien was increased in value to this extent. The Ruggles mortgage was to all intents and purposes a purchase-money mortgage. By co-ordinating the two mortgages, Ruggles, without any apparent reason or benefit, would have been deprived of three-fifths of his security. We find nothing in the evidence that leads us to the conclusion that Burnham intended such a result. His subsequent actions show that he understood that Ruggles had a first mortgage on A. He had personally guarantied the payment of the mortgage debts, and yet, when the mortgages were foreclosed, he bid in the entire half section for Edmonston for $1,000, leaving himself personally liable for the balance. The inference is that he understood that Edmonston was purchasing subject to the Ruggles mortgage. After the expiration of the time for redemption, Burnham took charge of the lands for his clients, and credited A to Ruggles and B to Edmonston, and thereafter paid the taxes upon each tract in the name of the respective owners. He also acted as Ruggles' agent in selling the quarter section in question. There are many other circumstances which point to the same conclusion. The weight of the evidence supports, instead of overthrows, the statutory presumption, and it follows that the court was in error in holding that the appellant and respondent are respectively the owners of equal undivided interests in the northwest quarter of section 6. The respondent Edmonston has no interest in said land.

The order from which the appeal was taken is therefore reversed, and a new trial granted.